UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
SECURITIES AND EXCHANGE COMMISSION, :
:
                          Plaintiff, : 11 Civ. 8094 (PAE)
:
              -v- : OPINION & ORDER
:
CHETAN KAPUR, :
LILABOC, LLC d/b/a/ ThinkStrategy Capital :
Management, LLC, :
:
                         Defendants. :
:
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff the Securities and Exchange Commission ("SEC") moves for an order directing defendants Chetan Kapur and Lilaboc, LLC d/b/a ThinkStrategy Capital Management, LLC ("ThinkStrategy") to disgorge the amounts gained as a consequence of their violations of the securities laws; the SEC also seeks an award of prejudgment interest and the imposition of third-tier civil penalties. For the reasons stated herein, the SEC's motion is granted.

**I.     Background**[1]

    **A.  The Parties and Relevant Events**

Kapur is a citizen of India and a resident of New York.  He is the founder and was at all relevant times the sole managing director and controlling principal of ThinkStrategy.  Compl. ¶¶ 9, 13.  ThinkStrategy is a Delaware company formed in November 2002, with its principal place of business in New York.  *Id.* ¶ 10.  It has never been registered with the SEC.  *Id.*  ThinkStrategy served as general partner and investment adviser to two hedge funds: ThinkStrategy Capital Fund (the "Capital Fund") and TS Multi-Strategy Fund (the "Multi-Strategy Fund").  *Id.*

In July 2003, Kapur formed the Capital Fund, a long-short market neutral hedge fund.  *Id.* ¶ 14.  In 2006, Kapur started a second share class for the Capital Fund—Capital Fund-B—which allocated capital to three independent sub-advisers and began trading in October 2006.  *Id.* ¶ 16.  The Capital Fund ceased operations in 2007.  *Id.* ¶ 11.

In mid-2004, Kapur founded the Multi-Strategy Fund, which invested in other hedge funds.  *Id.* ¶ 15.  In 2007, Kapur created a second share class for this fund—Multi-Strategy Fund-

---

[1] The consent judgments previously entered in this case provide, for purposes of this motion, that: (1) the allegations in the Complaint ("Compl.") shall be deemed true; and (2) the Court may consider affidavits and documentary evidence submitted by the parties.  *See* Dkt. 4–5.  Accordingly, the Court's account of the underlying facts is drawn from such materials, including: the SEC's Memorandum in Support of Motion for Judgment (Dkt. 13) ("Pl. Br.") and attached exhibits, including the Declaration of Jeffrey Anderson (Dkt. 13-7) ("Anderson Decl."); Defendants' Memorandum in Opposition to Motion for Judgment (Dkt. 16) ("Def. Br.") and attached exhibits; and the SEC's Reply Memorandum in Support of Motion for Judgment (Dkt. 20) ("Pl. Reply Br.") and attached exhibits, including the Supplemental Declaration of Jeffrey Anderson (Dkt. 20-1) ("Anderson Supp. Decl.").  The Court also takes notice of the evidence adduced during a bench trial over which the Court presided in which three of ThinkStrategy's investors brought similar claims against Kapur and ThinkStrategy.  Following that trial, the Court issued a 37-page decision finding Kapur and ThinkStrategy liable to those plaintiffs for fraud, negligent misrepresentation, and breach of fiduciary duty.  *See Schwarz v. ThinkStrategy Capital Mgmt., LLC*, No. 09 Civ. 9346 (PAE), 2012 WL 2026365 (S.D.N.Y. May 31, 2012) ("*Schwarz*").

2

B—which began investing in January 2008. *Id.* ¶ 17. In November 2010, the Multi-Strategy Fund entered into voluntary liquidation and was placed under the control of court-appointed receivers. *Id.* ¶ 12.

Kapur and ThinkStrategy made numerous misrepresentations to their investors regarding the funds' investment performance, *id.* ¶¶ 18–36; the funds' longevity and past performance, *id.* ¶¶ 37–44; the funds' assets under management, *id.* ¶¶ 45–48; the credentials and experience of ThinkStrategy's management team, *id.* ¶¶ 49–56; and the degree of due diligence performed on hedge funds in which the Multi-Strategy Fund invested, *id.* ¶¶ 57–80. *See generally Schwarz*, 2012 WL 2026365, at *2–13. These misrepresentations are the bases of the SEC's Complaint in this action.

### B. Procedural History

On November 10, 2011, the SEC filed a Complaint against the defendants, alleging violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(4), and Rule 206(b)(4)-8 promulgated thereunder, 17 C.F.R. § 275.206(4)-8. Dkt. 1. On November 16 and 18, 2011, this Court, upon consent of the parties, entered judgment against each defendant. Dkt. 4–5. The consent judgments provided that the defendants "shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and civil penalties" in amounts to be determined by the Court upon the SEC's motion. *Id.*

On March 20, 2012, the Court entered a consent order authorizing discovery regarding the money obtained by defendants from their illegal conduct and the defendants' current financial status. Dkt. 10. On March 29, 2012, the SEC noticed Kapur for a deposition. Dkt. 13-

4. That deposition never occurred, because Kapur repeatedly claimed that he was in India and too sick to travel to the United States. *See* Dkt. 13-5 (correspondence between SEC and defense attorneys, dating from March 21 to June 14, 2012). That excuse, however, was later revealed to have been a blatant lie: On July 16, 2012, Kapur was arrested at John F. Kennedy Airport, seeking to *leave* the United States. Passport and credit card records reflect that Kapur had been in the United States during the time period in which he had claimed to be in India. Dkt. 13-6 (letter from United States Attorney to Court and parties).

On August 10, 2012, the SEC filed this motion. Dkt. 12. On October 8, 2012, defendants filed a brief in opposition. Dkt. 16. On November 2, 2012, the SEC filed its reply. Dkt. 20.

## II. Discussion

The SEC moves for disgorgement, an award of prejudgment interest, and the imposition of civil penalties. The Court addresses these in turn.

### A. Disgorgement

"The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *Id.* at 1474–75. That amount "should include all gains flowing from illegal activities." *SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377, 425 (S.D.N.Y. 2012) (quoting *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395 (RWS), 2011 WL 666158, at *2 (S.D.N.Y. Feb. 14, 2011)). "When calculating disgorgement, however, 'separating legal from illegal profits exactly may at times be a near-impossible task.'" *Id.*

(quoting *SEC v. First City Fin. Corp. Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  Therefore, "[i]n fixing the size of any disgorgement award, the Court need only arrive at 'a reasonable approximation of profits causally connected to the violation.  So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty.'"  *SEC v. Boock*, No. 09 Civ. 8261 (DLC), 2012 WL 3133638, at *4 (S.D.N.Y. Aug. 2, 2012) (quoting *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).  "Where, as here, a fraud is pervasive, it is appropriate to order the defendant to disgorge all ill-gotten gains realized during the course of the fraud[ulent] scheme."  *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 253 (E.D.N.Y. 2011) (citing *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93–94 (2d Cir. 1986)).

"[I]t is well established that defendants in a disgorgement action are 'not entitled to deduct costs associated with committing their illegal acts.'"  *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 374–75 (2d Cir. 2011) (quoting *SEC v. Cavanagh*, No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *30 (S.D.N.Y. July 16, 2004), *aff'd*, 445 F.3d 105 (2d Cir. 2006)).  However, although defendants are not *entitled* to an offset for expenses, "[a] court may in its discretion, deduct from the defendant's gross profits certain expenses incurred while garnering the illegal profits."  *SEC v. Rosenfeld*, No. 97 Civ. 1467 (WHP), 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2011); *see also SEC v. Thomas James Assocs., Inc.*, 738 F. Supp. 88, 94 (W.D.N.Y. 1990) ("In determining the proper amount of restitution, a Court may consider as an offset the sums which a defendant paid to effect a fraudulent transaction.").  But this room for discretion "does not mean that a defendant can group his expenses under a broad category of business costs and accordingly expect deductions from the disgorgement amount without supporting evidence."  *Rosenfeld*, 2001 WL 118612, at *2.

Between 2003 and 2009,[2] ThinkStrategy collected management and incentive fees for managing the funds. Anderson Decl. ¶ 3. It deposited these fees in various bank accounts it held, which Kapur alone controlled. *Id.* Kapur did not maintain a separate personal account; he used the firm accounts to pay for his business and his personal expenditures. *Id.* Kapur reported no income, other than from ThinkStrategy, on his personal income returns. *Id.* Kapur did not maintain any books and records that distinguished between personal and business expenses. *Id.* In light of these facts, the SEC has reasonably based its calculation of Kapur's ill-gotten gains on his personal tax returns. These returns reflect aggregate gross receipts of $5,389,083 between 2003 and 2009. *Id.*; *see also id.* Exs. B–H (Kapur's 2003–2009 tax returns).

To be sure, Kapur's personal tax returns claim more than $7.5 million in business expenses between 2003 and 2009. Anderson Decl. Exs. 1–10. The SEC's investigating accountant attested that, of the claimed business expenses, only $2,086,812 were verifiable, supported by documentation, or otherwise appropriately deducted from Kapur's ill-gotten gains. *Id.* ¶ 4–5. The expenses that the SEC's accountant concluded were not verifiable include: manifestly personal expenses, such as a sports car and jewelry, *see* Anderson Supp. Decl. ¶¶ 2–3; expenses such as "travel" and "meals and entertainment" that were unsubstantiated and commingled with Kapur's personal expenditures, *id.* ¶ 4; and other expenses that were not and could not be verified, *id.* The SEC also determined that expenditures for "depreciation" were not appropriately deducted, and that expenses for advertising and website development were not appropriately deducted because the advertising and websites contained some of the material misrepresentations that were the basis for the complaint. *Id.* Accordingly, the SEC requests disgorgement in the amount of $3,252,271.

---

[2] To the extent defendants received any management fees in 2010, *see* Dkt. 16-1 at 3; Dkt. 17-1 (Kapur's 2010 tax return), the SEC has not sought disgorgement of the amount of these fees.

In opposing the SEC's request for that amount, defendants do not make arguments keyed to specific line items. Instead, defendants make three general arguments.

First, defendants broadly assert that the SEC wrongly declined to deduct business expenditures from its calculation of the proper amount of disgorgement. Def. Br. 2–4. Specifically, in a filing entitled "Proper Calculation of Income Relevant to Disgorgement," defendants claim that an additional "$1,094,9476" [sic] should have been deducted for expenses incurred between April 2003 and May 2008, and an additional $2,771,521 should have been deducted for expenses incurred between May 2008 and April 30, 2011. *See* Dkt. 16-1.[3] However, although defendants' submission recites the amount of Kapur's claimed business expenses on each of the relevant tax returns, it is entirely conclusory as to that point: In no way does it substantiate that any of these expenses were legitimate business expenses that are appropriately deducted. Nor do defendants make any effort to winnow out personal expenditures by Kapur. Rather, defendants merely "group [their] expenses under a broad category of business costs and accordingly expect deductions from the disgorgement amount without supporting evidence." *Rosenfeld*, 2001 WL 118612, at *2. This is manifestly inadequate, particularly in light of the substantial evidence the SEC has presented that Kapur commingled business and personal funds.[4]

---

[3] This filing is unsworn, and the statements in it are not attributed to any witness or declarant. To the extent the filing purports to validate the referenced exhibits as bona fide business expenses, it, therefore, has dubious evidentiary value. In any event, even if it were a sworn affidavit from a person with personal knowledge, it would be substantively deficient, because it is so unspecific.

[4] With respect to defendants' argument that expenses incurred in 2010 and 2011 should be deducted, it should be noted that the Capital Fund ceased operations in 2007, Compl. ¶ 11, and the Multi-Strategy Fund entered into voluntary liquidation in November 2010, *id.* ¶ 12. In any event, defendants have made no showing, other than broadly designating these expenses as

7

Second, defendants argue that the SEC has not established that the gross proceeds received by Kapur were all ill-gotten "profits," and that therefore ordering disgorgement of all profits without a corresponding deduction of all of Kapur's business expenses is impermissibly punitive.  Def. Br. 4–7.  In so arguing, defendants rely on several cases in this Circuit that discuss the disgorgement of "profits."  But, as the Second Circuit has explained, a court's authority to award disgorgement empowers it to award disgorgement of *all* gains transferred to a defendant based on his fraudulent representations:

> Although we sometimes refer casually to the power of district courts to "require wrongdoers to disgorge fraudulently obtained *profits*," . . .  that is because in many securities fraud cases the wrongdoer receives no direct monetary transfer from his victims. Where that is true, the defendant's ill-gotten gains are equal to the profits of his unlawful trading.  But where the profits from fraud and the defendant's ill-gotten gains diverge, the district court may award the larger sum.

*Bronson Partners*, 654 F.3d at 375 (emphasis in original) (citation omitted).  *Bronson Partners* makes clear that the district court may award the full amount of ill-gotten gains, *i.e.*, monies transferred to a defendant based on his fraudulent conduct, rather than merely net profits after deductions.  Such disgorgement is particularly appropriate where, as here, the fraud is pervasive, *see Razmilovic*, 822 F. Supp. 2d at 253, and separating legal from illegal profits is a "near-impossible task."  *Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d at 425 (citation omitted).[5]

---

business costs, to show why deductions are warranted for these expenses.  *See Rosenfeld*, 2001 WL 118612, at *2.

[5] Defendants appear to argue that the only funds in the Multi-Strategy Fund that were tainted by fraud were those fees allocable to the underlying fraudulent hedge funds in which the Multi-Strategy Fund had invested.  Def. Br. 5; Dkt. 16-1 at 1–2.  That is wrong.  The entirety of investors' investments were procured by means of false and fraudulent statements:  Had investors been aware that ThinkStrategy intended to invest in violation of its promise to conduct meaningful due diligence, it is fair to assume that these investors would not have invested at all.  *See, e.g.*, Compl. ¶¶ 37–56; *see also Schwarz*, 2012 WL 2026365, at *18.

It is also important to note that the SEC's task of differentiating between (1) Kapur's business and personal expenditures, and (2) legitimate and illegimate gains, was made "near-impossible" not only by Kapur's commingling of business and personal funds, but also by Kapur's flagrantly dishonest conduct in avoiding deposition, including in connection with this motion. *See* Dkt. 13-6. Such a deposition would have assisted the SEC in testing defendants' claims as to purportedly legitimate expenses. Kapur, as the person with sole control over ThinkStrategy's commingled accounts, was well-situated to help the SEC distinguish between business and personal expenses. Having eluded deposition through a series of false statements, he is estopped from now claiming that some of his expenditures might, upon a full inquiry, be shown to be legitimate business expenses. *Cf. Pegoraro v. Marrero*, 281 F.R.D. 122, 127 (S.D.N.Y. 2012) (finding that defendants who used their failure to comply with discovery schedule to their advantage were equitably estopped from arguing that plaintiffs did not file timely motion).

Defendants' third and final argument—that the requested amount of disgorgement is excessive—also falls short. Defendants attempt to characterize Kapur's misconduct as mild in comparison with other recent SEC proceedings, but that is unpersuasive. First, by entering into the consent judgments, defendants concede as true, for purposes of this motion, the extensive allegations of fraud made in the Complaint. *See* Dkt. 4–5. Second, this Court has already presided over a bench trial in a case in which three of ThinkStrategy's investors brought similar claims against Kapur and ThinkStrategy. Having closely reviewed the evidence of Kapur and ThinkStrategy's misconduct, the Court issued a lengthy decision, finding liability on claims of fraud, negligent misrepresentation, and breach of fiduciary duty. The Court noted, *inter alia*, that defendants had engaged in "tortious, callous, and unprofessional behavior." *Schwarz*, 2012

WL 2026365, at *19. These findings in a trial against the same defendants, based on conduct fully encompassed by the SEC's charges here, emphatically confirm the appropriateness of the proposed disgorgement award.

Accordingly, the Court finds that the SEC's proposed amount of disgorgement, $3,252,271, is a reasonable approximation of profits causally connected to the violations.

### B. Prejudgment Interest

A district court has "broad discretion" in deciding whether to award prejudgment interest. *First Jersey Secs.*, 101 F.3d at 1476. In exercising that discretion, "a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.* (citation omitted).

The consent judgments provide that the defendants "*shall* pay disgorgement of ill-gotten gains, [and] prejudgment interest thereon." Dkt. 4–5 (emphasis added). They further provide that "[p]rejudgment interest shall be calculated from January 1, 2005, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." *Id.* Applying this rate to the amount of disgorgement requested, the SEC seeks an award of $735,925.59 in prejudgment interest. Pl. Br. 11.

Despite the mandatory terms of the consent judgments, defendants argue that the Court should exercise its discretion in declining to award prejudgment interest. Even assuming, *arguendo*, that it had the discretion to override the previously entered consent judgments, the Court would not do so here. Considerations of fairness and equity weigh in favor of enforcing the parties' consensually agreed-upon judgment, and the other relevant factors weigh heavily in

favor of an award of prejudgment interest. Accordingly, the SEC's motion for an award of prejudgment interest in the amount of $735,925.59 is granted.

### C. Civil Penalties

The consent judgments also provide that defendants "shall pay . . . civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §§ 77t(d), 78u(d)(3) and 80b-9(e)]." Dkt. 4–5 (brackets in original). These provisions set forth three tiers of penalties. 15 U.S.C. § 77t(d)(2). First-tier penalties are the least severe. Second-tier penalties are warranted where the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id*. Third-tier penalties are warranted if a second-tier violation also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* The SEC seeks the maximum third-tier penalty, which is the greater of (i) the applicable statutory amount, based on the type of defendant and the time of the violation, or (ii) the gross amount of pecuniary gain to the defendant as the result of the violation. *Id.* In this case, defendants' gross pecuniary gain of $3,252,271 would be the greater of these two amounts.

"District courts have discretion in determining the appropriate amount of any penalty" under the relevant sections. *SEC v. Lybrand*, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003); *see also* 15 U.S.C. § 77t(d)(2) ("The amount of the penalty shall be determined by the court in light of the facts and circumstances."). Civil penalties are designed to deter securities law violations. *See Lybrand*, 281 F. Supp. 2d at 729 (citing *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998)). In determining the appropriate penalty, courts consider several factors, including:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their

11

> wrongdoing; (5) whether defendants' conduct created substantial losses or the risk
> of substantial losses to other persons; (6) defendants' lack of cooperation and
> honesty with authorities, if any; and (7) whether the penalty that would otherwise
> be appropriate should be reduced due to defendants' demonstrated current and
> future financial condition.

*Id.* at 730.

Defendants make two primary arguments why the Court should impose lesser penalities than the amount that the SEC requests. First, defendants cite *SEC v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y. 1996), for the proposition that there is an "unmistakable difference" between lesser conduct that constitutes fraud under relevant securities laws and conduct which was engaged in with the actual intent to defraud clients. Def. Br. 10. Although *Moran* does make such a distinction, in that case the Court found that the defendant had negligently committed fraud, and therefore only first-tier penalties were appropriate. *Moran*, 944 F. Supp. at 297. Here, by contrast, the Complaint alleges a wide-ranging course of intentionally fraudulent and deceptive conduct, placing Kapur on the opposite side of the distinction drawn in *Moran*. Compl. ¶¶ 1–3, 13–80.[6] Under the terms of the consent judgments, defendants cannot refute the Complaint's allegations on this motion. *See* Dkt. 4–5. This, coupled with the substantial losses to various investors caused by defendants' false and fraudulent statements, leaves little doubt that the prerequisites for third-tier penalties are met.

Second, defendants argue that any civil penalties "*must* be reduced to account for defendants' lack of resources." Def. Br. 11 (emphasis added). But the decision to impose civil penalties is in the court's discretion, and a defendant's financial condition is but one relevant

---

[6] The Complaint's allegations are, furthermore, confirmed by the trial evidence in the *Schwarz v. ThinkStrategy* litigation, as reflected in the Court's written decision. *See Schwarz*, 2012 WL 2026365, at *13–15.

factor. *See Lybrand*, 281 F. Supp. 2d at 729–30.[7]  And, although Kapur claims to lack resources, his refusal to sit for a deposition prevented the SEC from testing that claim.  For much the same reason, defendants' reliance on Kapur's cooperation with authorities in settling this case falls flat as a basis for substantially reduced civil penalties.  By evading deposition, Kapur inhibited the SEC from, *inter alia*, confirming whether he has assets that could have been made available to victimized investors.

That being said, the Court is persuaded that any remaining assets of Kapur's are unlikely to be substantial enough to permit him both to satisfy the award of disgorgement and prejudgment interest, which together total nearly $4 million, and to pay an additional substantial penalty.  Accordingly, considering the relevant factors, including Kapur's financial condition, the Court will not award the full third-tier penalty sought by the SEC, but instead only a portion of it.  The Court finds that a third-tier civil penalty of $1 million is sufficient to deter and punish defendants' securities law violations.

---

[7] The cases on which defendants rely for this argument are not to the contrary.  They are merely examples of courts exercising their discretion to take account of a defendant's lack of resources. *See SEC v. Soroosh*, 166 F.3d 343, 1998 WL 904696, at *2 (9th Cir. Dec. 24, 1998) (table); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1297–98 (M.D. Fla. 2001); *SEC v. Rubin*, No. 91 Civ. 6531 (MBM), 1993 WL 405428, at *6–7 (S.D.N.Y. Oct. 8, 1993).

## CONCLUSION

For the reasons stated herein, the SEC's motion for disgorgement is granted, in the amount of $3,252,271. The Court also awards $735,925.59 in prejudgment interest and $1,000,000 in civil penalties. A judgment in the amount of $4,988,196.59 will be entered in a separate order. The Clerk of Court is directed to close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: November 29, 2012
      New York, New York