```
                                                                    1
     F4u4schH
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    BENJAMIN SCHWARZ, et al,
3
4                 Plaintiffs,
4
5          v.                              09 CV 09346 (PAE)
5
6
6    THINKSTRATEGY CAPITAL
7    MANAGEMENT LLC, et al,
7
8                 Defendants.
8
9    ------------------------------x
9                                          New York, N.Y.
10                                         April 30, 2015
10                                         9:45 a.m.
11
11   Before:
12
12                 HON. PAUL A. ENGELMAYER,
13
13                                         District Judge
14
14                         APPEARANCES
15
15   GISKAN SOLOTAROFF ANDERSON & STEWARD LLP
16        Attorneys for Defendants
16   BY:  JASON L. SOLOTAROFF
17
17
18   CHETAN KAPUR
18   Pro Se
19
20
21
22
23
24
25
         SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300
```

```
                                                                  17
     F4u4schH
 1              MR. KAPUR:  Your Honor, I just wanted to give some
 2   background about Thinkstrategy Capital Management's
 3   comprehensive managed account program.  We had a comprehensive
 4   managed account program since inception at Thinkstrategy
 5   Capital Management.  We started our business by way of managed
 6   account.  Before we had any funds, we had managed accounts.  As
 7   part of our managed account program, your Honor, we regularly
 8   set up structures for clients, whether it be for their estate
 9   needs or their business needs or their investment needs or
10   their asset protection needs.  We set up structures for
11   clients.  We set up these structures in our name as though it
12   is for us and then transferred these structures to the client,
13   which was standard procedure, and it was per the client's
14   request.
15              The client then opened bank accounts and funded these
16   accounts, and we did a managed account on behalf of the client
17   with power of attorney or as per the managed account agreement.
18              Besides for providing structuring to clients, we also
19   provided administrative benefits and any sort of
20   administrative-related items that the clients needed related to
21   investments or otherwise, was also available as part of our
22   managed account program.
23              As part of the managed account program, we provide
24   customized portfolios.  We provided strategies similar to those
25   or same as those we provided within the funds, with customized
          SOUTHERN DISTRICT REPORTERS, P.C.           (212) 805-0300
```

```
                                                                    18
     F4u4schH
 1   solutions for principal protection, for leverage, for foreign
 2   exchange hedging.  Towards the latter part of the existence of
 3   Thinkstrategy, we also created an entity called Alternative
 4   Investment Management Advisory Group, and we moved our managed
 5   account program into -- we moved the product into a separate
 6   corporate entity called Aim Advisory Group, LLC, which was a
 7   managed account platform.  A managed account platform, as well,
 8   offered all the products of the comprehensive management
 9   account program, as well as standardized managed account
10   products.  That was an entity that eventually did not generate
11   any revenues.  Toward the end of 2011, we wound down that
12   entity.
13           Having provided just a cursory background on our
14   managed account program, I also have just some documents out
15   here and some exhibits generally to address what I'm going to
16   say.
17           THE COURT:  Sure.  Do you have a copy for
18   Mr. Solotaroff, as well as for me and my law clerk?
19           MR. KAPUR:  Yes.  Very good.
20           THE COURT:  I'm going to ask Ms. Hummel to mark this
21   package as Defendant's Exhibit 1, April 30th, 2015.  I'll note
22   for the record, though, that there is a cover note on the
23   documents that Mr. Kapur has handed up, which indicates that
24   there are five exhibits here, numbered 1 through 5.
25           One moment, Mr. Kapur.
         SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300
```

```
                                                                     19
     F4u4schH
 1              (Pause).
 2              This will be Defendant's Exhibit A.  Ms. Hummel
 3   corrects me.
 4              Thank you.
 5              Go ahead, Mr. Kapur.
 6              MR. KAPUR:  Yes, your Honor.  I just want to talk a
 7   little bit more about the structuring as it relates to the
 8   managed account program.  Clients used to come to us and say,
 9   set up XYZ foundation or trust for their estate planning needs
10   or set up XYZ business for their business needs or XYZ
11   investment structure for their investment asset protection
12   needs.  We went about and contacted trust companies, law firms,
13   registered agents in the jurisdictions that they wanted to
14   create the particular structure, and we created the structure
15   for them and then transferred the structure to them.  So it was
16   similar to the way that a law firm or trust company might set
17   up something at the registrar in their name and transfer it to
18   us.  We, by the same token, created on behalf of our clients
19   and then transferred the structure to our clients.  It was
20   standard practice in the managed account field.  It is what our
21   clients' wanted because it allowed them to avoid weeks and
22   months of KYC at the law firm or trust company.
23              I was talking about a managed account programs and the
24   structuring in a managed account program.  We set up structures
25   for estate planning purposes, for business purposes, for
          SOUTHERN DISTRICT REPORTERS, P.C.           (212) 805-0300
```

F4u4schH
1  investment purposes at these law firms, at these trust
2  companies, at the request of our client and on behalf of our
3  client as though it was for us so that -- you know, our clients
4  did not want to get involved in weeks and months of KYC with
5  the law firm or the trust company.  They wanted us to set up
6  the structure and transfer the structure over to them.  That
7  was standard proceed in the managed account field, your Honor,
8  and it was always what our clients preferred.  The law firm or
9  the trust company used to set up the company in their name with
10  the registrar as if it was for them, and they would transfer it
11  to us.  So it's a similar kind of procedure that the law firm
12  or the trust company did for us, we did for our clients:
13          THE COURT:  I understand what you have said so far,
14  but I will need you to relate this to what Mr. Solotaroff has
15  said.  It doesn't seem responsive to what he is raising.
16          MR. KAPUR:  Yes, your Honor.
17          Mr. Solotaroff mentioned a lot of different things.
18          Firstly, in Exhibit 1, you know, he asked me about
19  managed accounts, and I said that yes, it is possible that we
20  set up accounts in Switzerland for managed accounts.  Other
21  than managed accounts that I opened?  Yes?  And I said no.  I
22  believe that testimony to be accurate because we did set up
23  accounts wherever our clients wanted it, whether it be in a
24  Swiss-based bank, whether it be in the U.S. branch of a
25  Swiss-based bank, wherever it be with U.K. branch or in the

```
                                                              21
     F4u4schH
1    Swiss branch.  Wherever they wanted an account opened, we would
2    open for them at one or more banks or brokerages per the needs
3    of our clients in the managed account program.
4              Moving forward to Mr. Solotaroff's exhibits, he put
5    several exhibits from the law firm of Mossack Fonseca, which I
6    believe provide trust services.  This was one of several law
7    firms and trust companies that we worked with as part of our
8    managed account program, and they were conducting standard KYC
9    on their clients.  In phase 1 of our managed account program,
10   we used to set up the structure in our name as though it was
11   for us.  Either which way, these law firms and trust companies
12   have to conduct KYC on the person they're dealing with and the
13   person that is paying the invoices.  Whatever KYC that they
14   had, it was for the purpose of setting up the structure for
15   them to complete the KYC, which often took from weeks
16   to months.  As you can see from the emails, they extend across
17   a couple of months.  That was one of the key reasons that
18   clients wanted us to create the structure and then transfer the
19   structure over to them.  In phase 2, if there were any
20   amendments to be made, they would be made at that point in
21   phase 2.  Phase 3 related to the funding of the account with
22   the client, used to fund this structure.  Phase 4 was when we
23   did a managed account for a power of attorney, if they wanted
24   to do a managed account.
25             Your Honor, Mr. Solotaroff mentioned the fact that
         SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300
```

22

F4u4schH

1  Ms. Rai sold her car, provided testimony of Ms. Rai's letters
2  and her in-court testimony in Exhibit 1, Defendant's Exhibit 1,
3  noting -- which is also an SEC Plaintiff Exhibit 24, submitted
4  by Mr. Roessner of the SEC, where Ms. Rai says that when I sold
5  my car in March 2013, the proceeds from the sale were used to
6  partially pay down my bank, credit card, and personal loans.
7  So Ms. Rai is noting to the Court the fact that she had bank,
8  credit card, and personal loans, and that she used those
9  proceeds largely to pay down those loans partially.
10          Further, Exhibit 1, in court testimony as it relates
11 to that, as well as in Exhibit 2, provides the loan agreement
12 that Manju Kapur had with Bina Rai.  And Bina Rai already
13 mentioned this loan several times in her in-court testimony.
14 And when she sold the car, she paid approximately $11,500 off
15 that loan back to Manju Kapur, including I believe some
16 additional installments that Manju gave to Bina of
17 approximately $9,000.
18          As it relates to the Chase credit card bill, it is
19 clear that that bill, your Honor, was paid by Manju Kapur and
20 not Bina Rai.  I had asked my mother several times if she could
21 please pay my Chase credit card bill because it had been called
22 in and was charging me extremely high interest rates.  She said
23 she was not in a position at that time to pay the Chase credit
24 card bill, but when she had the cash flow available in her
25 account, she would look into and see whether she would be

```
     F4u4schH
 1   willing and able to pay my Chase bill.
 2            Once Ms. Rai sold her car and paid her loans at
 3   Citibank partially and credit card loans, as well as partially
 4   repay Manju Kapur, Manju Kapur was then in a cash flow position
 5   to help me out with my Chase credit card bill.  Manju Kapur
 6   thereafter went ahead and paid my Chase credit card bill.  I
 7   just felt it appropriate to ask my mother and my parents, who
 8   have substantial assets, to pay my Chase bill when it was
 9   called in as opposed to going to Bina, who had already extended
10   herself extensively based on her sources of income.  But had I
11   gone to Bina, the Chase credit card bill would clearly be noted
12   in her loan agreement, which it is not.  It is noted on my
13   mother's loan agreement because my mother is the one who paid
14   the Chase credit card bill.  Hopefully, that clarifies any
15   confusion as it relates to that matter with testimony and
16   letters from Ms. Rai.
17            Looking through Mr. Solotaroff's exhibits, in Exhibit
18   Number 13, once again, both SEC and Mr. Solotaroff have noted
19   some other structuring work with another firm, Asia City Trust.
20   We had structuring with several law firms and several trust
21   companies, not only the few that are mentioned by the SEC.  The
22   SEC mentions Asia City Trust, as well as, I believe, an
23   International Kurasel Bank, which was all part of our managed
24   account structuring work for our clients, but there were
25   several other law firms, trust companies, and banks and
```

F4u4schH

1  brokerages that we work with as part of our managed account
2  program at Thinkstrategy Capital, not just the ones mentioned
3  by Mr. Roessner or present here today in these exhibits by
4  Mr. Solotaroff.  I think it is important that be noted.
5           Mr. Roessner claims in his recent submission to the
6  Court that The Family and Children Charitable Foundation was
7  set up after March 2010, where my former attorney apparently
8  filed a motion to dismiss that was denied, but this was simply
9  part of a managed account program structuring.  Clearly, from
10 Mr. Roessner's own exhibits, Asia City, as well as from First
11 International Kurasel, are just two examples off structuring
12 work we did for our managed account program prior to
13 March 2010.
14          THE COURT:  Tell me about The Family and Children
15 Charitable Foundation.
16          MR. KAPUR:  Your Honor, that was a part of what one of
17 our clients wanted as part of the managed account program.
18          THE COURT:  Who is your client?
19          MR. KAPUR:  I don't know.  I don't recall the client.
20 Having spoken to Ms. Rai about her wires into her account, she
21 did note to me that she did ask my brother, Kabir Kapur, for a
22 loan.
23          THE COURT:  You're talking about Ms. Rai?
24          MR. KAPUR:  I am, your Honor.
25          THE COURT:  I'm asking you about The Family and
         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
                                                                  25
        F4u4schH
 1      Children Charitable Foundation.  Is it your testimony to me
 2      that that foundation was set up to benefit one of your clients?
 3               MR. KAPUR:  Several possibilities, your Honor.
 4               THE COURT:  No, no.  You told me a moment ago it was a
 5      client.
 6               MR. KAPUR:  Generally, it was a client.  I would
 7      consider whoever it was created for would be for a client, but
 8      I have a belief --
 9               THE COURT:  A client of Thinkstrategy?
10               MR. KAPUR:  Correct.
11               THE COURT:  Tell me how you know that.
12               MR. KAPUR:  I don't -- the reason I believe that to be
13      the case, your Honor, is for two reasons:  On speaking with
14      Ms. Rai about these loans back in 2010 or 2011, where she
15      received two loans for approximately seventy four, seventy-five
16      thousand dollars, I asked her who these loans were from, where
17      did she get these moneys from.  She noted she contacted my
18      brother, Kabir, who has been in the private lending and
19      consulting business for the past 15 years, and asked him for a
20      loan, and he organized a loan through one of his private
21      lending relationships.  I'm just trying to connect --
22               THE COURT:  When you say that The Family and Children
23      Charitable Foundation was to benefit one of your clients, you
24      don't mean it was to benefit your family, right?  It was for a
25      client that is completely independent of the Kapur family;
            SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300
```

```
     F4u4schH
 1   correct?
 2            MR. KAPUR:   Correct, your Honor.
 3            THE COURT:   What is your basis --
 4            MR. KAPUR:   That is my assumption.
 5            THE COURT:   You told me a moment ago of your belief
 6   that The Family and Children Charitable Foundation is to
 7   benefit one of your clients.  I'm not interested in Ms. Rai.
 8   I'm interested in the foundation.  Please answer my question --
 9            MR. KAPUR:   I'm trying --
10            THE COURT:   Please don't interrupt me.
11            What is your basis for, as you put it, assumption that
12   the foundation is to benefit a client of yours?  There are
13   emails that connect you to the foundation.  I'm having
14   difficulty understanding what you're trying to tell me.
15            MR. KAPUR:   Yes, your Honor.  Firstly, it is an item
16   from five years ago, and I tried to think about who exactly, as
17   part of our managed account program, this structure could have
18   been created for.  All I know is that it appears to be for a
19   client.  It appears to me that it very possibly could be a
20   private lending relationship of my brother.  My brother had
21   numerous private lending relationships.
22            So the structure, having spoken to Ms. Rai on her
23   loans and having recalled the fact that I did create a
24   structure several years ago for one of my brother's private
25   lending relationships, I'm assuming that the structure was,
            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300
```

```
F4u4schH
```

1  therefore, created for one of my brother's private lending
2  relationships.
3          THE COURT:  You told me a moment ago this had nothing
4  to do with your family.
5          MR. KAPUR:  Your Honor, it has to do with, not my
6  family, but one of my family members' private lenders.
7          THE COURT:  What is Mossfon, what is the Mossfon Trust
8  Corporation?
9          MR. KAPUR:  Your Honor, it is a trust company.  It is
10 part of the law firm -- there is a global law firm that we
11 worked with, that we were referred to.  As you can see from the
12 emails of Mr. Roessner, we were referred to this law firm that
13 does trust and structuring-related work.  It was one of several
14 law firms that we worked with and one of several trust
15 companies we worked with.
16         THE COURT:  There is one of the exhibits that
17 Mr. Solotaroff submitted.  It contains an exhibit.  It is
18 Exhibit 7, in which you express an intent to deposit something
19 like six to seven million dollars in the Family and Children
20 Charitable Foundation account.  What does that relate to?  Can
21 you explain?
22         MR. KAPUR:  That relates to our KYC.
23         THE COURT:  KYC is "know your customer"?
24         MR. KAPUR:  "Know your client."
25         THE COURT:  Go ahead.

```
                                                                      28
     F4u4schH
 1              MR. KAPUR:  The law firms or trust companies always
 2   conducted KYC, which was "know your client" on the customer or
 3   client that they were dealing with.  As an investment
 4   management company, they were required to conduct KYC on us,
 5   the people that we're dealing with.  As I mentioned prior, our
 6   managed account program had four phases.  The first phase of
 7   our program was to structure the product as though it was for
 8   us on behalf of the client in our name.  And then we used to,
 9   in phase 2, transfer the product and structure to the client.
10   We were in phase 1, going through the KYC of this trust
11   company.  You know, we offering, whether it be with the
12   structuring company or the bank that we dealt with for managed
13   account program purposes, personalized the managed accounts --
14   well, for different reasons.  Well, let me not go into that.
15              Just to kind of stay focused on the question, they
16   were conducting KYC for us, and simply we were representing at
17   that phase, in phase 1, that the structure was for us, but we
18   were providing the funding amount on the account of the client.
19   There is no way that my fund, which is --
20              THE COURT:  Was Bina Rai a customer of Thinkstrategy?
21              MR. KAPUR:  A customer, no.
22              THE COURT:  She was not a client or customer of
23   Thinkstrategy, correct, Bina Rai?
24              MR. KAPUR:  No.
25              THE COURT:  Can you explain to me why she received, at
        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300
```

F4u4schH

least according to Exhibits 18 and 19, wires of approximately $74,000 and $72,000 from Mossfon, accompanied by notes referencing this Family and Children Foundation? Can you explain that to me?

MR. KAPUR: Having spoken to Ms. Rai, Ms. Rai noted to me that she had requested my brother, Kabir Kapur -- was in the private lending business and consulting business for the past 15 years, by way of background -- for a loan. Kabir had noted to her that he is going to organize a loan for her from one of his private lending relationships. Accordingly, these are representing those loans. I believe the private lender happened to use Mossack Fonseca law firm. It is a global law firm known for providing legal, as well as trust-related services, as well as escrow, accounting, and other professional services. It seemed that the lender happened to use Mossfon escrow services as part of providing this loan.

THE COURT: Does The Family and Children Charitable Foundation exist to benefit you?

MR. KAPUR: No, your Honor.

THE COURT: Have you ever received any money directly from it?

MR. KAPUR: No, your Honor.

THE COURT: Have you ever received any money from somebody who themselves had recently been paid money from that foundation?

```
                                                              30
     F4u4schH
 1              MR. KAPUR:  Could you repeat the question, your Honor?
 2              THE COURT:  Would the court reporter please read my
 3   question back.
 4              (Record read)
 5              MR. KAPUR:  I have recently received money from
 6   anybody who has recently received money from that foundation?
 7              No, your Honor, but I would just qualify that Ms. Rai
 8   did give me loans in general.  The source of her loans was a
 9   combination of factors of her income, her savings, as well as
10   her borrowings.  So Ms. Rai's source of funding, if you will,
11   not only for the loans that she provided me, but a general
12   source of funding for her personal expenses, her business
13   expenses, paydown of credit cards when she felt appropriate,
14   and providing me loans was three sources.  One would be income.
15   Another would be savings.  And third would be her borrowings.
16              THE COURT:  Apart from the previous testimony that
17   Ms. Rai gave before me, are you aware of any other source of
18   income she has, apart from what was covered in her prior
19   testimony?
20              MR. KAPUR:  Prior testimony?
21              THE COURT:  You were here for her testimony; correct?
22              MR. KAPUR:  Yes, your Honor.
23              THE COURT:  Apart from what she testified to, are you
24   aware of any other source of income that she has?
25              MR. KAPUR:  No, your Honor, I'm not aware other than
            SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300
```

```
                                                              31
        F4u4schH
 1   what I believe to be the case, as I mentioned, and what she
 2   might have mentioned when she was in court.
 3            THE COURT:  Is there anything else you want to say to
 4   me today?
 5            We're going to be scheduling a hearing, at which I
 6   expect to hear testimony from you, but is there anything
 7   further you want to say to me today to explain the transactions
 8   that the SEC and Mr. Solotaroff and SEC are drawing to my
 9   attention?
10            MR. KAPUR:  Just give me a minute.
11            THE COURT:  Of course.
12            MR. KAPUR:  Talked about the managed account program
13   and KYC --
14            THE COURT:  Don't speak to yourself.  Speak to me.
15   But, please, the court reporter doesn't know whether to write
16   down when you're talking to yourself.
17            MR. KAPUR:  I would just note, your Honor, that as it
18   relates to Exhibit 12 that I only recently had a conversation
19   with Ms. Rai once Mr. Roessner submitted these exhibits to get
20   explanation on those loans from what appear to be a company
21   that has the same name as the company that we did the
22   structuring work at.  I will note that it is very possible that
23   because my brother has several private lending relationships,
24   it might be the same structure, it might also be a similarly
25   named structure but of a different private lender of my
          SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300
```

```
                                                                  32
     F4u4schH
 1   brothers.  One family -- because my brother, several of his
 2   private lending relationships are family groups who might know
 3   each other and know of each other, and they might be using the
 4   same name.  However, the structures might be completely
 5   different.  The structure that Ms. Rai is getting the loan from
 6   might be in a different jurisdiction, it might have been set up
 7   by a different law firm.  It might have a totally different
 8   purpose or structural objective that could be charitable and
 9   not private.
10           The CHIPS data that Mr. Roessner submitted in his
11   Excel spreadsheet where he notes in his recent submission that
12   he redacted some information and he changed the spacing of the
13   information on CHIPS, the one issue I have when going through
14   this data is the fact that when I see Ms. Rai's bank
15   statements, it shows money coming from Deutsche Bank and from
16   HSBC U.S.  When I look at the Mr. Roessner's wire instruction,
17   it shows moneys are going from Bank Vontobel to HSBC London.
18   That seems like a major disconnect to me.  I understand what
19   Mr. Roessner is trying to theorize, and I feel that's a
20   possibility, but it is also very possible that that lender does
21   not have an account at Bank Vontobel or possibly could.
22           I would also note that the Family and Children
23   Charitable Foundation, because of my recollection of having set
24   up the structure for one of my brother's private lenders a
25   while back, as well as my conversation with Rai, I believe it
          SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300
```

F4u4schH

```
 1   to be and I assume it to be a structure that was set up for one
 2   of my brother's private lenders, but it may not be the same
 3   lender as the one loaning moneys to Ms. Rai.  It could also
 4   possibly be a structure that we set up for a client who knows
 5   of my brother's private lenders or entities.
 6            THE COURT:  Anything further you would like to say at
 7   this juncture?  I'm not requiring you to do so.  I'm giving you
 8   an opportunity to explain.
 9            MR. KAPUR:  Yes, your Honor.
10            I also see an Exhibit 14 where there's some
11   communication as it relates to a managed account at Bank
12   Sarasin.  I will also note that when we dealt with the
13   day-to-day team at the bank for our managed accounts, we often
14   personalized assets and often give an optimistic view as part
15   of our general procedure to receive better servicing from the
16   bank.  We often, doing several managed accounts and small
17   managed accounts, did not receive the type of servicing we
18   needed to meet the demands, the very reasonable demands of our
19   client.  They wanted complete, accurate, timely, and
20   comprehensive reporting on their moneys, and often we took
21   advantage of the fact that the bank didn't know who the owners
22   of the accounts were.  They often assumed that the people that
23   we were dealing with were the owners, and we even gave that
24   impression and emphasized the fact that we were owners to try
25   and receive better servicing.
```

```
                                                                    34
        F4u4schH
 1              I already mentioned that as part of a comprehensive
 2      managed account program we provided both structuring and
 3      administrative services to any managed account client.
 4              And I would also note that I understand
 5      Mr. Solotaroff's theory that CCO, Limited, which is something
 6      he asked me about last time on a Wachovia Bank statement, which
 7      was one of umpteen Wachovia bank statements that have very
 8      large amount transactions that we conducted at Thinkstrategy
 9      Capital, I did not recollect what the buyer related to.  There
10      were several possibilities, though, that we discussed from it
11      being an error reversal, as well as the possibility that that
12      wire related to payment for services rendered by a service
13      provider or possibly even could have been a rebate to an
14      institutional client.  But I didn't have -- being that the item
15      was related to one of our several counter parties, we worked
16      with hundreds, if not thousands, of counter parties from fund
17      investors to managed account clients to institutional advisors
18      to retail advisors to potential clients, we worked with
19      hundreds and thousands of counter parties, so I did not
20      recollect at the time specificity of the details of that
21      transaction.  I know Mr. Solotaroff is trying to connect that
22      client name with the client name that is similar in this email.
23      And while his theory might be a possibility, I also feel it is
24      possible that the CCO mentioned in this email might be a Dag
25      name for an account of a totally different structure because
                SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300
```

```
                                                                     35
     F4u4schH
 1   clients often gave a Dag name of a total different structure.
 2   CCO out here could be CCO, Inc. it could be CCO, LP.  It could
 3   be CCO Corporation.  It could be CCO-whatever.  And most
 4   certainly, the bank had clients with similar names.  And we, at
 5   Thinkstrategy, definitely had clients with similar names.  I
 6   put that possibility out there to say that the connection that
 7   Mr. Solotaroff made might not be accurate.
 8            THE COURT:  Thank you.
 9            Mr. Solotaroff, is there anything further you want to
10   say today?
11            MR. SOLOTAROFF:  Not today, Judge.
12            THE COURT:  I will be back in five minutes to schedule
13   a final hearing and with some specifications I want to set out
14   about that.
15            (Recess)
16            THE COURT:  Mr. Kapur, I'm going to be issuing an
17   order later today, and I want to make sure that we have current
18   contact information for you, to assure that it gets to you.
19            I take it you have not registered for electronic
20   filing, for ECF, in this case; correct?
21            MR. KAPUR:  Correct, your Honor.
22            THE COURT:  What is your current email address?
23            MR. KAPUR:  CKAPUR10@gmail.com.
24            THE COURT:  Do you check that every day?
25            MR. KAPUR:  I check it regularly, your Honor.
          SOUTHERN DISTRICT REPORTERS, P.C.           (212) 805-0300
```